UNITED STATES, Appellee,

v.

Alisa SCHWABAUER, Specialist
U.S. Army, Appellant,

and

UNITED STATES, Appellee,

v.

Steven P. SCHWABAUER, Specialist
U.S. Army, Appellant.

Nos. 67,907, 67,925.
CMR Nos. 9100602, 9100893.

U.S. Court of Military Appeals.

Argued Jan. 7, 1993.

Decided Aug. 18, 1993.

For Appellant (Alisa Schwabauer): *Captain Teresa L. Norris* (argued); *Colonel*

Robert B. Kirby and Major Fran W. Walterhouse (on brief); Lieutenant Colonel James H. Weise and Captain Michael P. Moran.

For Appellant (Steven P. Schwabauer): Captain Robert L. Carey (argued); Colonel Malcolm H. Squires, Jr. and Captain Robin N. Swope (on brief); Colonel Robert B. Kirby.

For Appellee (both cases): Captain Gregory T. Baldwin (argued); Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg, Major Timothy W. Lucas (on brief).

## Opinion of the Court

GIERKE, Judge:

Specialists Alisa Schwabauer and Steven P. Schwabauer were tried on identical charges at separate trials by different military judges sitting as special courts-martial. The offenses occurred and appellants were tried while their unit was deployed with the 3d Armored Division in a combat zone. Both appellants were convicted, consistent with their pleas, of willful disobedience of an order issued by a noncommissioned officer and wrongful disposition of a rifle and bayonet, military property of the United States, "by wrongfully placing them on the ground and walking away" (Alisa) and "by casting away the same" (Steven), in violation of Articles 91 and 108, Uniform Code of Military Justice, 10 USC §§ 891 and 908, respectively. The military judge sentenced Specialist Alisa Schwabauer to a bad-conduct discharge, confinement and partial forfeitures for 3 months, and reduction to Private E–1. A different judge sentenced Specialist Steven P. Schwabauer to a bad-conduct discharge, confinement for 4 months, partial forfeitures for 6 months, and reduction to Private E–1; but that judge recommended suspension of the discharge and the confinement. In both cases the same officer acting as convening authority approved the sentence but remitted the unserved confinement. In both cases the Court of Military Review affirmed the findings and sentence but reassessed the sentence to provide only for a bad-conduct discharge and reduction to Private E–1. United States v. Alisa Schwabauer, 34 MJ 709, 713 (1992); United States v. Steven P. Schwabauer, unpub. op. at 2 (February 11, 1992).

We granted review of the same issue in both cases:

WHETHER THE ARMY COURT ERRED IN HOLDING THAT APPELLANT'S PLEA OF GUILTY TO WRONGFUL DISPOSITION OF GOVERNMENT PROPERTY WAS PROVIDENT WHERE THE PROPERTY NEVER LEFT GOVERNMENT CONTROL.

The stipulated facts pertinent to the granted issue are identical in both cases. Appellants are husband and wife. On February 4, 1991, at approximately 1:20 p.m. they both approached Command Sergeant Major Cook and told him, in effect: "We are sick of this, we can't take any more, we want to quit the Army." Specialist Alisa Schwabauer stated that she was "tired of being lied to about being deployed in a combat situation." She explained to CSM Cook that she had been promised she would not be deployed with a forward unit in a combat zone. Specialist Steven P. Schwabauer was worried about his wife being in a combat situation. As CSM Cook was talking to the two appellants, they both placed their M16A2 rifles and bayonets on the ground, and walked away from CSM Cook holding hands. CSM Cook ordered them to stop and come back, but they kept walking. CSM Cook repeated the order, and the two appellants stopped. Prior to their encounter with CSM Cook, both appellants previously had been ordered to keep physical control and possession of their weapons at all times while in the 3d Armored Division Tactical Assembly area.

During Specialist Alisa Schwabauer's guilty-plea inquiry, she responded to the military judge as follows regarding the alleged wrongful disposition of military property:

MJ: —Now, what couldn't you take anymore?

ACC: My fears, nobody listening to me, the way everybody kept telling me, "Don't worry"; just the nonchalance everybody was putting to my requests, my concerns, my fears. At that time Command Sergeant Major Cook said, "Follow me." We walked over to my section's area. We went and found Chief [Warrant Officer] Summers. They—We sat down right outside the tent. Chief Summers and him talked for approximately 20 minutes, and they went to find Major Browning, our battalion executive officer. Command Sergeant Major Cook then came back. He again asked us what was bothering us. I explained to him about my fears; that, I had sought counseling in Frankfurt; that, I'd seen a chaplain; and I felt nobody was paying attention to me. At that time he called me selfish and I again felt that he was not listening to me. And I felt it necessary to put my weapon down and my bayonet down and walk away to draw attention to my fears before I ended up causing somebody's death. I realize now that it was wrong. I should have done something else....

MJ: Okay. So you put your weapon down and the bayonet down?

ACC: Yes, sir.

\* \* \*

MJ: And then what happened?

ACC: We stood up. The Sergeant Major—

MJ: —When you say "we," you and your husband?

ACC: Yes, sir. The Sergeant Major approached Steve. I pushed Steve back. We walked away. Steve—The Sergeant Major said, "Stop." We kept walking. He said, "Stop" again. And then we stopped after the second time.

\* \* \*

MJ: Now, tell me why you put your weapons down.

ACC: After everything I had done, sir, I had—it came to my mind the fastest way to get everybody's attention was to do something drastic. It seemed the most

expedient way, by placing our weapons down.

MJ: So, when you put those weapons down, you walked away from those weapons, is that correct?

ACC: Yes, sir.

MJ: Did you, at the time that you put those weapons down, *intend to give up those weapons?*

ACC: *Yes, sir.*

MJ: Who was present when you put those weapons down?

ACC: Command Sergeant Major Cook, myself, my husband, and First Sergeant Roberts, my company's First Sergeant.

\* \* \*

MJ: And did you know what would happen to those weapons after you put them down?

ACC: Excuse me, sir, could you—

MJ: Okay, sure. You put the weapons down, and you walked away?

ACC: Yes, sir.

MJ: When you put those weapons down *did you intend on disposing of those weapons and getting rid of those weapons?*

ACC: *Yes, sir.*

MJ: And did you care or know what would happen to those weapons after you walked away?

ACC: Sir, I walked away to—For myself. I was crying at the time. *I did not care what happened to those weapons.*

MJ: Were you abandoning those weapons or were you giving them back to the military?

ACC: Can you define the difference, sir?

MJ: Yeah. With respect to weapons there's ways of turning weapons in or giving weapons—giving them to the Sergeant Major, I guess. Now, did you— That would be getting the weapons to him. *Or did you intend on just leaving those weapons there and didn't really care what happened to those weapons?*

ACC: Yes, sir—*The second one, sir.*
(Emphasis added.)

During Specialist Steven P. Schwabauer's guilty plea inquiry, he explained his conduct as follows:

MJ: All right. You indicated that you—I think the term that you used was you simultaneously laid down your weapons, is that correct?

ACC: Yes, Your Honor.

\*   \*   \*

MJ: So you put the weapon on the ground and then laid the bayonet beside it?

ACC: Yes, Your Honor.

\*   \*   \*

MJ: How far away from the weapons did you walk?

ACC: I think it was about 20 feet, Your Honor, 20 or 30 feet.

MJ: Now, at the time that you laid the weapon down with the bayonet and you walked away from it, *was it your intent to just be done with the weapon and abandon it and never see it again?*

ACC: *Yes, Your Honor.*

MJ: Because that's part of the offense here. Now, obviously, I guess at some point you stopped, but at the time that you walked away from the weapon, after you put it on the ground.... *But is it in fact accurate that your intent at that point was to be done with the weapon and abandon it?*

ACC: *Yes, Your Honor.*

\*   \*   \*

MJ: Well, let me see if I understand something else. I think in the stipulation you indicated that you had an order—or you had received an order either commensurate with arriving in theatre or prior to arriving in theatre that you would keep the weapon, that is your M16A2, and your bayonet on your person at all times, is that correct?

ACC: Yes, Your Honor.

MJ: All right. So you knew that you were supposed to have that weapon and you walked away from it?

ACC: Yes, Your Honor.

MJ: Now I'll go back to the question I asked you before. Was it your intent— Give me just a minute. Let me see if I understand this. Is it your testimony that you did not intend to permanently dispose of the weapon?

ACC: No, Your Honor.

MJ: That is not your testimony or it is your testimony?

ACC: *We intended to permanently dispose [of] the weapon.*

MJ: Oh, okay. *So once you put it down you had no intent of ever picking that weapon up again?*

ACC: *Yes, your Honor.*
(Emphasis added.)

Appellants now contend that their guilty pleas were improvident because the rifles and bayonets never left government control and, therefore, were never disposed of. We hold that the pleas were provident.

■ A military judge may not accept a plea of guilty unless satisfied that there is a factual basis for the plea. RCM 910(e), Manual for Courts–Martial, United States, 1984. A military judge must question an accused to determine "whether the acts or the omissions of the accused constitute the offense ... to which he is pleading guilty." *United States v. Care*, 18 USCMA 535, 541, 40 CMR 247, 253 (1969). The facts as revealed by an accused must "objectively support th[e] plea." *United States v. Davenport*, 9 MJ 364, 367 (CMA 1980). The military judge has a "duty to ensure that an accused not plead guilty to an offense of which he [or she] is in fact not guilty." *United States v. Hanson*, 24 MJ 377, 379 (CMA 1987).

■ The question raised by the granted issue is whether the facts admitted by appellants constitute a violation of Article 108. That article provides, in pertinent part: "Any person subject to this chapter, who, without proper authority ... sells or otherwise disposes of ... any military property of the United States, shall be punished as a court-martial may direct." The article prohibits "the unauthorized surren-

der of the use of, the control over, or the ostensible title to, military property." Abandonment is a disposition within the meaning of Article 108. *United States v. Faylor*, 8 USCMA 208, 209, 24 CMR 18, 19 (1957).

■ Since appellants pleaded guilty, we must determine whether there is a sufficient "factual basis" objectively to support their admissions that they abandoned their weapons. *See* RCM 910(e); *cf. United States v. Prater*, 32 MJ 433, 436 (CMA 1991) (there must be "substantial basis" for rejecting guilty plea). We hold that there is a sufficient factual basis to support the guilty pleas in both cases.

Appellants cite *United States v. Holland*, 25 MJ 127 (CMA 1987), for the proposition that "disposition" requires "some form of alienation of the property from the Government by the accused." 25 MJ at 128. In that case the accused stole two truck engines and stored them in a government warehouse, intending to install one in a personal vehicle and dispose of the other in an unspecified manner. The accused was caught before he could carry out his intentions.

*Holland* is distinguishable from appellants' cases. That case involved an attempted transfer of property, not abandonment; and the plea inquiry revealed that the motor vehicle engines were neither transferred nor abandoned. 25 MJ at 128. *Holland* involved organizational property which never left government control; appellants' cases involved individually issued property which the recipients were required to keep under their personal control.

Both appellants admitted that they walked away from their weapons, intending permanently to relinquish possession and surrender personal control. Both appellants stipulated that they had been ordered to keep their weapons in their personal possession while in the tactical assembly area and that they were not authorized to surrender their weapons to CSM Cook or anyone else. *See* para. 32c(2), Part IV, Manual, *supra* (Article 108 may be violated by "deliberate violation or intentional disregard of ... law, regulation, or order."); *United States v. Banks*, 15 MJ 723, 724 (ACMR 1983) (conviction of wrongful disposition upheld even though recipient was government informant authorized to accept the items), *aff'd on other grounds*, 20 MJ 166 (CMA 1985). Alisa Schwabauer told the military judge she did not care what happened to her weapons. Steven Schwabauer told the military judge he intended to dispose of his weapons and never pick them up again. He admitted to the military judge that he walked away from his weapons, knowing that he was required to keep them in his possession at all times.

The fact that two noncommissioned officers were in the immediate vicinity who were likely to recover the abandoned weapons does not render the guilty pleas improvident, since Article 108 "is not concerned with improper receipt of military property, but with its improper disposition." *United States v. Faylor*, 8 USCMA at 209, 24 CMR at 19. Until one of those noncommissioned officers took it upon himself to recover the weapons, they were in no one's control. We agree with the Court of Military Review that the likelihood of the weapons being recovered by the noncommissioned officers present at the scene may be a matter in extenuation and mitigation, but it does not render the pleas improvident. *United States v. Alisa Schwabauer*, 34 MJ at 712.

## DECISION

*As to United States v. Alisa Schwabauer, No. 67907:*

The decision of the United States Army Court of Military Review is affirmed.

*As to United States v. Steven P. Schwabauer, No. 67925:*

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge (dissenting):

I dissent from the majority opinion. I conclude that, as a matter of law, appellants did not wrongfully dispose of military property as required by Article 108, Uniform Code of Military Justice, 10 USC § 908. *United States v. Faylor*, 8 USCMA 208, 24 CMR 18 (1957); *cf. United States v. Holland*, 25 MJ 127, 128 (CMA 1987) (Sullivan, J., dissenting).

Pursuant to their guilty pleas, appellants were found guilty of the wrongful disposition of military property, Article 108(3), as a lesser-included offense of willful misbehavior before the enemy (by casting away arms or ammunition), Art. 99, UCMJ, 10 USC § 899. Article 108 provides:

> Any person subject to this chapter who, without proper authority—
> (1) sells or otherwise disposes of;
> (2) willfully or through neglect damages, destroys, or loses; or
> (3) willfully or through neglect suffers to be lost, damaged, destroyed, sold, or *wrongfully disposed of;*
> any military property of the United States, shall be punished as a court-martial may direct.

(Emphasis added.)

The legal issue on this appeal is whether there was a wrongful disposition. In *United States v. Faylor, supra,* this Court held that an unauthorized abandonment of military property is a disposition within the meaning of Article 108. 8 USCMA at 209, 24 CMR at 19. However, the precise definition of abandonment was not explicitly set forth, perhaps because *Faylor* involved a more obvious type of abandonment, *i.e.,* a government vehicle was abandoned below the embankment of a narrow road and was discovered 6 days later. Nevertheless, *Faylor* does provide the foundation for a three-prong test for determining abandonment.

First, the act must be "a surrender of dominion and control over the property for the time it is out of the hands of authorized persons." *United States v. Faylor, supra.* Second, the Government must be "deprived of the use of the property." *Id.; see United States v. Holland, supra* at 128 (Sullivan, J., dissenting); *see also United States v. West*, 17 MJ 145, 148 (CMA 1984) (Everett, C.J., dissenting) ("[T]he gravamen of Article 108 is the loss to the United States of the benefit and use of military property."). And third, implicit in the act must be an intent to temporarily or permanently deprive the Government of the property. *See United States v. Faylor, supra* (citing *United States v. Brown*, 8 USCMA 18, 23 CMR 242 (1957)).

Although appellants surrendered dominion and control over the rifles and bayonets, they did not deprive the Government of the weapons. CSM Cook and the company first sergeant were immediately available, and arguably had a duty, to secure the rifles and bayonets. Notwithstanding the fact that placing the rifles and bayonets on the ground is not the proper turn-in procedure, such action did not deprive the Government of control over the use of the military property. Finally, appellants' actions simply do not support the inference that they intended to temporarily or permanently deprive the Government of the weapons. Their actions might be tantamount to a dereliction of duty to secure an individual weapon, *see* para. 4–1b(1), Army Regulation 190–11 (31 March 1986), but not wrongful disposition of military property by abandonment.

Applying this three-prong test for abandonment to the case *sub judice,* I conclude that appellants may not be convicted of wrongful disposition of military property by placing their rifles and bayonets on the ground in the vicinity of their superior noncommissioned officers. Furthermore, the respective military judges did not fully inform appellants of the element of wrongfully disposing. Moreover, they did not establish the factual components of the guilty plea. *See United States v. Care*, 18 USCMA 535, 540, 40 CMR 247, 252 (1969).